# UNITED STATES DISTRICT COURT

## NORTHERN _____ DISTRICT OF ____ ILLINOIS, EASTERN DIVISION ____

**MAGISTRATE JUDGE BROWN**

UNITED STATES OF AMERICA

**UNDER SEAL**

v.

**12 CR 829**

HSIEN TAI TSAI, also known as "Alex Tsai"

**CRIMINAL COMPLAINT**

**CASE NUMBER:**

I, <u>Eric Shiffman</u>, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.

### Count One

Beginning no later than in or about August 2009 and continuing until at least in or about August 2010, in the Northern District of Illinois and elsewhere, defendant HSIEN TAI TSAI, also known as "Alex Tsai," knowingly and willfully conspired with Individual GT and others, known and unknown, to defraud the United States Department of the Treasury and the United States government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the proliferation of weapons of mass destruction by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

### Count Two

Beginning no later than in or about August 2009 and continuing until at least in or about August 2010, in the Northern District of Illinois and elsewhere, defendant HSIEN TAI TSAI, also known as "Alex Tsai," knowingly and willfully conspired with Individual GT and others, known and unknown, to evade and avoid the prohibitions and restrictions imposed by the Office of Foreign Asset Controls, United States Department of Treasury, on HSIEN TAI TSAI and his companies, Trans Merits Co., Ltd., and Global Interface Company, Inc., as proliferators of weapons of mass destruction, in violation of 50 U.S.C. §§ 1705(a) and (c), and Title 31, Code of Federal Regulations, Parts 544.201 and 544.205.

**FILED**

10-23-12

OCT 2 3 2012

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

## **Count Three**

In or about September 2009, in the Northern District of Illinois and elsewhere, defendant HSIEN TAI TSAI, also known as "Alex Tsai," knowingly and willfully conspired with Individual GT and others, known and unknown, to commit an offense against the United States in violation of Title 18, United States Code, Section 1956, specifically, to transmit and transfer funds, namely, approximately $7200, from a place outside the United States, namely the Republic of China (Taiwan), to a place in the United States, with the intent to promote the carrying on of specified unlawful activity, namely, the offense charged in Count Two of this complaint; all in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and (h).

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

### **SEE ATTACHED AFFIDAVIT**

Continued on the attached sheet and made a part hereof:  __X__ Yes  ____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

October 23, 2012
Date

at  Chicago, Illinois
City and State

GERALDINE SOAT BROWN
United States Magistrate Judge
Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF ILLINOIS          )
                           )
COUNTY OF COOK             )

**AFFIDAVIT**

I, Eric Shiffman, having been duly sworn, hereby depose and state:

## I.     Agent Background and Purpose of the Affidavit

1.      I am a Special Agent with the Federal Bureau of Investigation and have been so employed since 2005. I am currently assigned to the Chicago Field Office, where I investigate, among other things, cyber crimes. From in or about October 2008 to September 2012, I was assigned to a counter-intelligence squad in the Chicago Field Office, where my responsibilities included investigating the illegal transfer of goods, utilities, and services regulated by the United States Departments of State, Commerce, and Treasury. As part of my duties, I have received specialized training in the counter-proliferation of weapons of mass destruction.

2.      I make this affidavit in support of a criminal complaint charging Hsien Tai Tsai, also known as "Alex Tsai" (hereinafter "Alex Tsai"), with:

a.      conspiring with Individual GT and others, known and unknown, to defraud the United States Department of the Treasury and the United States government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the proliferation of weapons of mass destruction, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371;

b.      conspiring with Individual GT and others, known and unknown, to evade and avoid the prohibitions and restrictions imposed by the Office of Foreign Asset Controls, United States Department of Treasury, on HSIEN TAI TSAI and his companies, Trans Merits

–1–

Co., Ltd., and Global Interface Company, Inc., as proliferators of weapons of mass destruction, in violation of 50 U.S.C. §§ 1705(a) and (c), and Title 31, Code of Federal Regulations, Parts 544.201 and 544.205; and

        c.     money laundering conspiracy, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and (h).

    3.   Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the attached criminal complaint, I have not included every fact known to me and other law enforcement officers regarding Alex Tsai or the charged offenses.

## II.   Summary of Probable Cause

### A.   The Investigation

    4.   The FBI and the Department of Homeland Security have been investigating a network of individuals and companies that are engaged in the export of United States origin goods and machinery that could be used to produce weapons of mass destruction. Subjects of the investigation include Hsien Tai Tsai, also known as "Alex Tsai" (hereinafter "Alex Tsai"), his son, Individual GT, and Individual A, a business associate of Alex Tsai and Individual GT. According to ICE records: Alex Tsai is a Taiwanese national and is believed to reside in Taiwan; Individual GT was born in Taiwan, maintains Taiwanese citizenship, and is a permanent resident alien of the United States living in Glenview, Illinois; and Individual A is a Taiwanese national and is believed to reside in Taiwan.

    5.   The investigation has revealed that Alex Tsai, Individual GT, and Individual A are associated with at least three companies based in Taiwan – Global Interface Company, Inc. ("Global Interface"), Trans Merits Co., Ltd. ("Trans Merits"), and Trans Multi Mechanics Co.,

Ltd. ("Trans Multi Mechanics") – that have purchased and then exported, and attempted to purchase and then export, from the United States machinery used to fabricate metals and other materials with a high degree of precision, as further described below.

6.     In or about June 2008, Alex Tsai and Trans Merits were indicted in Taiwan for illegally forging invoices and shipping restricted materials to North Korea. Later that year, Alex Tsai and Trans Merits were convicted.

7.     On January 16, 2009, pursuant to Executive Order 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters"), the United States Department of Treasury, Office of Foreign Assets Control ("OFAC"), designated, among others, Alex Tsai, Global Interface, and Trans Merits proliferators of weapons of mass destruction and thereby prohibited any U.S. citizen, permanent resident alien, U.S. company, or any person or company in the United States from knowingly engaging in any transaction or dealing with Alex Tsai, Global Interface, or Trans Merits.

8.     The investigation has revealed that, prior to the OFAC designation, Alex Tsai, Individual GT, Individual A, and others used Trans Merits and Trans Multi Mechanics interchangeably to purchase and export machinery from the United States by, for example, using Trans Multi Mechanics to fund the purchase of machinery but then exporting that machinery to Trans Merits. (*See* paragraphs 17-74 below for a description of three such transactions.)

9.     The investigation has further revealed that subsequent to the OFAC designations, Alex Tsai, Individual GT, and Individual A conspired to evade and evade the OFAC designations by continuing to conduct business in the United States, but attempted to hide Alex Tsai's and Trans Merit's involvement in those transactions by conducting business under

different company names. For example, beginning no later than August 2009 – approximately 8 months after the OFAC designation – Alex Tsai, Individual GT, Individual A, and others began using Trans Multi Mechanics to purchase and export machinery on behalf of Trans Merits and/or Alex Tsai. Specifically, Alex Tsai, Individual GT, and Individual A conspired to export from the United States a Bryant Center Hole Grinder, which is a machine tool used to grind a center hole, with precisely smooth sides, through the length of a material. According to industry materials, the Bryant center hole grinder is capable of grinding holes between .050 inches and 2 inches in diameter. (*See* paragraphs 86-116 below for a description of this transaction.)

10.     The investigation has further revealed that, beginning no later than September 2009, Individual GT formed a machine tool company named Factory Direct Machine Tools, located in the Northern District of Illinois, which was in the business of importing and exporting machine tools, parts, and other items to and from the United States. However, the investigation has established that Alex Tsai and Trans Merits were active partners in Factory Direct Machine Tools, in some instances procuring the goods for import to the United States for Factory Direct Machine Tool customers. (*See* paragraphs 117-127 below for a description of three such transactions.)

11.     Based on the information contained herein, I believe there is probable cause to conclude that Alex Tsai, Individual GT, and others have conducted and are continuing to conduct business together under various names in violation of laws of the United States designed to thwart the proliferation of weapons of mass destruction.

**B.**     **The Email Accounts**

12.     The investigation has revealed that Individual GT has used at least 3 email addresses to conduct business with Alex Tsai and Trans Merits after the 2009 OFAC designations: yhtsai76@yahoo.com, yht.gary@gmail.com, and gary@factorydirectmt.com.

13.     The investigation has revealed that Alex Tsai has used at least 3 email addresses to conduct business with Individual GT: trans.merits@msa.hinet.net, dragon.inco@gmail.com, and global.inco@gmail.com.

14.     As part of this investigation, the government obtained 8 search warrants in connection with 5 of the above email accounts associated with Individual GT and Alex Tsai. The government also obtained search warrants for email accounts held by third parties. Each of the search warrants was issued by a United States Magistrate Judge for the United States District Court for the Northern District of Illinois.

15.     A number of the emails obtained through the search warrants were written in Chinese and have been translated into English by government linguists. Translations set forth in this affidavit are preliminary in nature and are not intended to be final translations.

16.     Throughout this affidavit, I have set forth the substance of a number of email communications involving Alex Tsai, Individual GT, and other parties. Unless otherwise noted, the emails so referenced were obtained by the government through one of the above-described search warrants. In addition, when the substance of an email appears in quotes, the emails have been quoted verbatim.

### III.     Factual Background

#### A.     The Pre-OFAC Designation Transactions

##### 1.     Overview

17.     This section sets forth three transactions conducted by Alex Tsai, Individual GT, Individual A, Trans Merits, and/or Trans Multi Mechanics before OFAC designated Alex Tsai and Trans Merits proliferators of weapons of mass destructions.  These transactions demonstrate that, prior to the OFAC designations, Alex Tsai, Individual GT, and Individual A openly conducted business interchangeably through Trans Merits and Trans Multi Mechanics, with no meaningful distinction between the two companies.

18.     Although the details of each transaction are unique, each transaction followed the same general pattern:

- Individual GT negotiated the purchase of the machinery, acting on behalf of Trans Merits;

- Individual GT copied Trans Merits and/or Trans Multi Mechanics on emails about the specific transaction; sometimes Individual GT copied both; other times only Trans Merits or Trans Multi Mechanics;

- Individual GT requested payment for the machinery in emails to Trans Merits;

- After Individual GT requested payment from Trans Merits, funds were transferred from Trans Multi Mechanics's bank account in Taiwan to Individual GT's bank account in the United States; Individual GT then used the funds to pay for the machines or to reimburse himself; and

- The machines were exported from the United States to Trans Merits in Taiwan.

19.     The evidence establishes that Alex Tsai was the "director" of Trans Merits and involved in each of these particular transactions.  This evidence includes:

- A 2008 U.S. visa application in which Alex Tsai stated that he was the director of Trans Merits;

- Records showing that Alex Tsai, Individual GT, and Individual A traveled to at least 4 machine tool companies located in the United States in August and September 2008, including 3 from which they purchased machinery in Fall 2008;

- Emails from Individual GT to the machine tool companies: (a) arranging visits for Individual GT and his "partners"; and (b) following up on specific machinery examined during those visits by Individual GT and his "partners," who had since "returned to Taiwan."

- Emails from Individual GT to trans.merits@msa.hinet.net stating, for example:

  - "The following is the shipping date for the Sansei SS-501, please print out for Mr. Tsai ..." (As explained below in paragraphs 20-34, this email corresponds with a purchase of a Sansei SS-501 from Company SMM in August 2008.)

  - "This is the invoice — if convenient, after Mr. Tsai has seen it, please give to the vessel company, okay?? I'll ask for the packing list from the factory ..." (As explained below in paragraphs 51-74, the invoice associated with this email relates to a purchase of a Mitsui Seike HT-4 from Company J in November 2008.)

### 2. Company SMM (Pre-Designation Transaction 1)

#### a. Summary of Transaction

20.     In or about August and September 2008, Individual GT negotiated for and then purchased a Sansei 20" rotary surface grinder[1] from Company SMM, which is located in Warren, Michigan, for export to Trans Merits in Taiwan. The machine was paid for using funds transferred from Trans Multi Mechanics's bank account in Taiwan to Individual GT's bank account. During the negotiations, Individual GT exchanged emails with both Trans Merits and

---

1. According to an industry executive, the Sansei SS-501 is a rotary surface grinder. Rotary surface grinders are used to produce precision ground surfaces, either to a critical size or for the surface finish, such as, among other things, rings and gaskets. According to the same industry executive, he previously worked with a company that used surface grinders to produce rocket parts.

Trans Multi Mechanics. In addition, Alex Tsai, Individual GT, and Individual A visited Company SMM in late August 2008 to inspect the machine before they purchased it.

### b. Timeline of transaction

21. On or about August 1, 2008, Individual GT sent an email from yhtsai76@yahoo.com[2] to Individual MC at Company SMM referencing a prior conversation and requesting an invoice for a Sansei 20" surface grinder (model SS-501). The email was copied to tmm.news@msa.hinet.net and trans.merits@msa.hinet.net.

22. On or about August 1, 2008, Individual MC at Company SMM sent an email to trans.merits@msa.hinet.net, which was copied to Individual GT, attaching an invoice for the used rotary surface grinder for $12,000.

23. On August 1, 2008, Individual GT sent an email to tmm.news@msa.hinet.net attaching the invoice from Company SMM.

24. On or about August 4, 2008, Individual GT sent an email to Individual WC at Air Tiger Express, requesting shipping rates from Los Angeles, California, to Taiwan.

25. According to records obtained from Citibank, on or about August 12, 2008, a check was written from Individual GT's account to Company SMM in the amount of $12,000.

26. On or about August 19, 2008, Individual GT sent an email to Trans Merits at trans.merits@msa.hinet.net in which he provided, among other things, the account number and routing number for his Citibank bank account.

27. According to records obtained from Citibank, on or about August 20, 2008, $13,985 was wire transferred into Individual GT's Citibank account by Trans Multi Mechanics.

---

2. All of the emails referenced in this affidavit as being sent to or from Individual GT were sent from yhtsai76@yahoo.com unless otherwise noted.

28.    On August 25, 2008, Individual GT sent an email to trans.merits@msa.hinet.net, attaching the invoice and packing list from Company SMM and stating: "pls print it out and confirm if thy were fine for shipping ....."

29.    According to records maintained by Department of Homeland Security, Customs and Border Protection ("CBP"), on September 2, 2008, Alex Tsai, Individual GT, and Individual A crossed into the United States from Canada in a vehicle registered to Individual GT at the Ambassador Bridge in Detroit, Michigan.

30.    When questioned by a CBP officer while crossing into the United States on September 2, 2008, Alex Tsai and Individual A indicated that they were headed to Warren, Michigan.  According to ICE records, Company SMM is located in Warren, Michigan.

31.    On September 2, 2008, Individual GT sent an email to trans.merits@msa.hinet.net, stating: "The following is the shipping date for Sansei SS-501, please print out for Mr. Tsai."

32.    According to records maintained by the Department of Homeland Security, on or about September 3, 2008, a rotary surface grinder was exported to Trans Merits Co., Ltd., in Taipei, Taiwan.  The identified U.S. principal party in interest was a company referenced as "[Company SMM], 11430 Kaltz Avenue, Warren, MI 48089 US," the shipper was Air Tiger Express, and the listed sales price of the rotary grinder was $12,000.

33.    On or about September 9, 2008, someone using trans.merits@msa.hinet.net sent an email to Individual GT containing an arrival notice for the Sansei SS-501 in Taiwan.

34.    On or about September 16, 2008, Individual GT sent an email to trans.merits@msa.hinet.net stating, "The attachment includes the travel costs to the States and

the transportation fee for the used machines. Please print it out and give to Mr. Tsai." The attachment includes, among other things, itemized costs for airfare and hotels for Alex Tsai, Individual GT, and Individual A, including a hotel stay in Michigan, and a "U.S. border bridge toll" at the "U.S. Canada border."

### 3. Company T (Pre-Designation Transaction 2)

#### a. Summary of Transaction

35.     In or about September and October 2008, Individual GT negotiated for and then purchased another used Sansei 20" rotary surface grinder for $10,500 from Company T, located in Santa Paula, California, for export to Trans Merits in Taiwan. The machine was paid for using funds transferred from Trans Multi Mechanics's bank account in Taiwan to Individual GT's bank account. During the negotiations, Individual GT exchanged emails with both Trans Merits and Trans Multi Mechanics. In addition, Alex Tsai, Individual GT, and Individual A visited Company T in late August 2008 to inspect the machine before they purchased it.

#### b. Timeline of transaction

36.     On or about August 6, 2008, Individual GT sent an email to Individual R at Company T in which Individual GT stated: "It's [Individual GT] from Trans Merits" and requested pictures and quotes for three Sansei machines. That same day, Individual R sent an email to Individual GT attaching pictures of a Sansei SS-501 rotary surface grinder.

37.     On or about August 8, 2008, Individual GT sent an email to Individual R at Company T, stating: "We are planning to visit your company around end of August....That will be great if you let me know when you will be available."

38. On August 11, 2008, Individual GT sent an email to trans.merits@msa.hinet.net, providing his Citibank account information.

39. On or about August 21, 2008, Individual GT sent an email to Individual R at Company T, stating: "Yes, we are still interested in those machines. As I mentioned before, two of my partners and I are going to your company and check those machines on August 28th on Thursday. Please let me know what time you prefer."

40. According to records obtained from United Airlines, Individual GT flew from Chicago O'Hare International Airport to Los Angeles International Airport on August 27, 2008.

41. According to records maintained by CBP, Alex Tsai and Individual A entered the United States on August 27, 2008, after arriving at LAX on a United Airlines flight from Taipei, Taiwan.

42. On or about August 28, 2008, Individual R sent an email to Individual GT stating: "Hi [Individual GT]. It was very nice to meet you and your partners today hope they like the machines if you customers are not interested please let me know asap as i have another customer interested in the grinders."

43. On or about September 8, 2008, Individual GT sent an email to Individual R at Company T, replying to the above email and stating: "Sorry for late response. We are interested in your machine #2588 [the Sansei SS-501] and would like to offer you USD 10,500.00 on truck FOB your factory for it. If you agreed with our offer, please send me your invoice."[3] That same

---

3. Based on my training and experience, I know that the term "FOB" is a term used in shipping goods and can mean "free on board" or "freight on board." Within the United States, the term "FOB" is commonly used when shipping goods to indicate which party is responsible for paying the loading and transportation costs, and/or the point at which the responsibility of the goods transfers from seller to buyer. For example, in this case, the phrase "on truck FOB your factory" indicates that the buyer would pay the shipping costs and would take responsibility for the machinery after the machinery was loaded onto a truck at the seller's factory.

day, Individual R from Company T sent a reply to Individual GT's email, accepting the offer:

"Hi [Individual GT], I do accept your offer of $10,500 loaded on truck."

44.     On or about September 10, 2008, Individual R sent Individual GT an email attaching an invoice to Trans Merits Co., Ltd. for the Sansei grinder and asking for Trans Merits's address.

45.     According to records obtained from Citibank:

a.     On or about September 23, 2008, $20,000 was wired from Trans Multi Mechanics to Individual GT's account at Citibank; and

b.     On or about September 25, 2008, $10,500 was wire transferred from Individual GT's Citibank account to the bank account of Company T.

46.     On or about October 1, 2008, Individual GT sent an email to tmm.news@msa.hinet.net, attaching pictures of the wrapped Sansei grinder.

47.     On or about October 1, 2008, Individual GT sent an email to trans.merits@msa.hinet.net, attaching export documents and packing list received from Company T.

48.     On or about October 2, 2008, Individual GT sent an email to trans.merits@msa.hinet.net attaching the invoice for the Sansei Grinder.

49.     According to records maintained by CBP, on or about October 22, 2008, a used Sansei Grinder Machine was exported to Trans Merits Co., Ltd., in Taipei, Taiwan. The identified U.S. principal party in interest was a company referenced as "[Company T] Santa Paula, CA" the shipper was listed as Air Tiger Express, and the listed sales price of the rotary grinder was $10,500.

50.     On June 3, 2009, Individual GT sent an email to Individual R at Company T, stating: "We bought a 20" Sansei surface grinder last year ... We are looking for a flange plate for it. Do you have one fit for it?"

### 4. Company J (Pre-Designation Transaction 3)

#### a. Summary of Transaction

51.     In or about September and October 2008, Individual GT negotiated for and then purchased a Mitsui Seiki HT-4A Horizontal Machining Center[4] for $36,650 from Company J, located in Barberton, Ohio. The machine was paid for using funds transferred from Trans Multi Mechanics's bank account in Taiwan to Individual GT's JP Morgan Chase Bank account. During the negotiations, Individual GT exchanged emails with both Trans Merits and Trans Multi Mechanics about the transaction. In addition, Alex Tsai, Individual GT, and Individual A visited Company J in early September 2008 to inspect the machine before they purchased it.

#### b. Timeline of transaction

52.     On or about June 24, 2008, someone using trans.merits@msa.hinet.net sent an email to Individual GT asking Individual GT to inquire about a used Mitsui Seiki HT4A Machining Center at Company J; the email contained an attachment with a request to Company J on Trans Merits letterhead.

---

4. According to an industry executive, a horizontal machining center is a type of milling machine consisting of a spindle mounted parallel to the floor. A horizontal machining center works by holding the material stationary while it is shaped by rotating, milling cutters. A milling machine can produce a variety of items based on the materials and machine tool tolerances. According to the industry executive, the Mitsui Seiki HT-4A is a four-axis horizontal machine tool capable of producing extremely accurate machine parts.

53.     Between July 24, 2008, and July 30, 2008, Individual GT exchanged a series of emails with Individual DN at Company J about purchasing a Mitsui Seiki HT4A Machining Center from Company J.

54.     On July 30, 2008, Individual DN at Company J sent an email to Individual GT, quoting a price of $35,000 FOB Barberton for the Mitsui Seiki HT4A Machining Center.

55.     On July 30, 2008, Individual GT sent an email to tmm.news@msa.hinet.net, attaching photos of the Mitsui Seiki Machining Center and noting that the machine cost $35,000 FOB Barberton, Ohio.

56.     On July 30, 2008, Individual GT sent an email to Individual DN at Company J, thanking Individual DN for a list of machines, stating that "we reviewed the list," and asking for more information about certain machines at Company J.  This email was copied to both trans.merits@msa.hinet.net and tmm.news@msa.hinet.net.

57.     On August 20, 2008, Individual GT sent an email to Individual DN at Company J, following up on the availability of other machines and advising "we are planning to visit you and check up machines of Mitsui Seiki and Takisawa on the first week of September.  Please let me know when you will be available."

58.     According to Starwood Hotels and Resorts, Individual GT checked into a Four Points Hotel in Akron, Ohio on September 1, 2008.   According to Google Maps driving directions, that hotel is approximately 13.4 miles from Company J.

59.     On September 2, 2008, Individual GT sent an email to Individual DN at Company J discussing the visit to Company J and indicating that Individual MR showed them the Mitsui

Seiki and other machine tools. Individual GT also asked follow up questions regarding certain machines they viewed during their visit.

60.     On September 17, 2008, Individual GT sent an email to Individual DN at Company J stating: "After my partners went back to Taiwan, we had been busy all the time and not have a chance to discuss about your machines till now. We decided to make you an offer ..."

61.     Between September 18, 2008, and October 20, 2008, Individual GT exchanged a series of emails with Individual DN at Company J and Individual WC at Air Tiger Express, in which Individual GT negotiated the purchase of the Mitsui Seiki HT-4A Machining Center from Company J and the shipment of that machine to Taiwan by Air Tiger Express.

62.     On October 17, 2008, Individual DN sent an email to Individual GT, asking for, among other things, a purchase order number and advising that Company J would make out the invoice to:

> Trans Merits Co., Ltd.
> f.No.49 Lane 280
> 1 Guangfu S Rd
> Taipei, Taiwan
> Attn Individual GT.

63.     On October 17, 2008, Individual GT responded to the above email, providing a purchase order number of TMM-080911010 and correcting the address for Trans Merits to:

> 1F. No. 49, Lane 280, Guangfu S. Road.
> Taipei, Taiwan

64.     On or about October 21, 2008, Individual A, using tmm.news@msa.hinet.net, emailed Individual GT confirming that the "client" has decided to purchase the Mitsui Seiki HT-

4A Machining Center, and giving Individual GT instructions to pass on to the seller about how to best disassemble and package the machine for shipping.

65. On October 26, 2008, Individual GT sent an email to trans.merits@msa.hinet.net, providing his bank account information, and stating: "I will confirm with [Company J] about the address to receive the machines."

66. According to records obtained from JP Morgan Chase Bank, on October 27, 2008, $31,982 was wired from Trans Multi Mechanics bank account in Taiwan to Individual GT's bank account at Chase Bank, held in the name of "[Individual GT]'s Global Interface."

67. On October 31, 2008, someone using trans.merits@msa.hinet.net sent an email to Individual GT, forwarding a message from Triple Eagle Forwarding, a shipping company located in Taiwan. In the forwarded email, which was sent to trans.merits@msa.hinet.net and addressed to "President Tsai," Triple Eagle Forwarding providing the contact information for its agent located in the Chicago area – namely, AGI Logistics in Itasca, Illinois.

68. According to records obtained from JP Morgan Chase Bank, on or about November 4, 2008, $36,650 was wire transferred from Individual GT's account at Chase to Company J's bank account.

69. Between November 24, 2008, and December 23, 2008, Individual GT and Individual DN at Company J exchanged a series of emails in which they discussed shipping the machine to Taiwan.

70. On December 24, 2008 Individual GT sent an email to trans.merits@msa.hinet.net attaching the invoice for the Mitsui Seiki Machining Center from

Company J: "This is the invoice — if convenient, after Mr. Tsai has seen it, please give to the vessel company, okay?? I'll ask for the packing list from the factory ..."

71.     On December 26, 2008, someone using trans.merits@msa.hinet.net sent an email to Individual GT, forwarding an email from a company called AGI Logistics, located in Itasca, Illinois, regarding the export of the Matsui Seike Machining Center from Company J.

72.     According to records maintained by CBP, on or about January 7, 2009, a Machining Center was exported from Company J to Trans Merits in Taipei, Taiwan. The identified U.S. principal party in interest was Company J, the shipper was AGI Logistics, and the listed sales price was $35,000.

73.     On January 16, 2009, Alex Tsai and Trans Merits were designated as proliferators of weapons of mass destruction.

74.     On February 26, 2009, someone using trans.merits@msa.hinet.net sent an email to Individual GT and tmm.news@msa.hinet.net, indicating that the Matsui Seiki Machining Center had arrived in Taiwan and attaching photographs of the machine being offloaded from a cargo ship.

**D.**     **The OFAC Designation of Alex Tsai, Global Interface, and Trans Merits as Proliferators of Weapons of Mass Destruction**

75.     The President of the United States of America, by virtue of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 *et seq.*) and other authorities, is granted authority to deal with unusual and extraordinary threats to the national security, foreign policy and economy of the United States. Section 1702 gives the President of the United States the authority to impose sanctions when he determines that there has been a threat to the national

security of the United States. Section 1705 criminalizes violations of any orders promulgated thereunder.

76.     In Executive Order 12938, promulgated on November 14, 1994, the President of the United States found "that the proliferation of nuclear, biological, and chemical weapons ("weapons of mass destruction" or "WMD") and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and hereby declare a national emergency to deal with that threat."

77.     In Executive Order 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters"), promulgated on June 28, 2005, the President of the United States ordered that specially designated WMD proliferators and members of their support networks be denied access to the U.S. financial and commercial systems. To implement that order, Executive Order 13382 prohibits any U.S. person, meaning any U.S. citizen, permanent resident alien, U.S. company (including their foreign branches), and any person or company in the United States, from engaging in any transaction or dealing with any party designated as a WMD proliferator under the authority of Executive Order 13382.

78.     The implementing regulations further provide that any transaction under Executive Order 13382 includes: (1) "The making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked"; and (2) "The receipt of any contribution or provision of funds, goods, or services from any person whose property and interests in property are blocked." 31 C.F.R. § 544.201(b).

79. The Treasury Department's Office of Foreign Assets Control ("OFAC") administers the blocking program, which initially applied to eight organizations in North Korea, Iran, and Syria. However, the President of the United States further authorized the Treasury Department, together with the Department of State, to designate additional WMD proliferators and their supporters under Executive Order 13382.

80. The parties blocked under Executive Order 13382 and subsequent designations include: (a) Korea Mining Development Trading Corporation, Central District, Pyongyang, North Korea; (b) Global Interface Company, Inc. (f.k.a. Trans Scientific Corp.), 9F-1, No. 22, Hsin Yi Rd., Sec. 2, Taipei, Taiwan; 1st Floor, No. 49, Lane 280, Kuang Fu S. Road, Taipei, Taiwan; (c) Trans Merits Co. Ltd., 1F, No. 49, Lane 280, Kuang Fu S. Road, Taipei, Taiwan; and (d) Hsein Tai Tsai (a.k.a. Tsai, Alex H.T.), c/o Trans Merits Co. Ltd., Taipei, Taiwan; c/o Global Interface Company Inc., Taipei, Taiwan.

81. According to information maintained by U.S. Department of Treasury and announced in a press release dated January 16, 2009, Alex H.T. Tsai was designated under Executive Order 13382 for providing, or attempting to provide, financial, technological, or other support for, or goods or services in support of the Korea Mining Development Trading Corporation (KOMID), which was designated as a proliferator by President George W. Bush in the June 2005 Annex to Executive Order 13382. In the press release, the Treasury Department further asserted that Alex Tsai "has been supplying goods with weapons production capabilities to KOMID and its subordinates since the late 1990s, and he has been involved in shipping items to North Korea that could be used to support North Korea's advanced weapons program. On

June 19, 2008, Tsai was indicted by Taiwan's Taipei District Prosecutors Office for forging shipping invoices and illegally shipping restricted materials to North Korea."

82.     According to information maintained by U.S. Department of Treasury and announced in a press release dated January 16, 2009, Global Interface was designated under Executive Order 13382 "for being owned or controlled by Tsai, who is a shareholder of the company and acts as its president. Tsai is also the general manager of Trans Merits Co. Ltd., a subsidiary of Global Interface Company Inc. that has been designated for being owned or controlled by Global Interface Company Inc."

83.     On or about January 18, 2009, an article was published in the Taipei Times, one of the major English language newspapers in Taiwan, reporting that Alex Tsai, his wife, Trans Merits, and Global Interface were sanctioned by the United States for shipping items to North Korea "that could be used to support North Korea's advanced weapons program." The article can be found at www.taipeitimes.com/News/front/print/2009/01/18/2003434057.

84.     On January 19, 2009, just three days after the designations, Individual GT signed up for and began receiving email notifications from the United States Department of Treasury of the OFAC notifications. This email notification, and subsequent emails received by Individual GT, included links to lists of designated companies, including Alex Tsai, Trans Merits, and Global Interface.

85.     On or about January 22, 2009, the American Institute in Taiwan, which represents the United States government in Taiwan, sent Alex Tsai a letter at his home address, informing Alex Tsai that his visa had been cancelled because he fell "within a class of inadmissible persons to the United States."

E.    **The Post-OFAC-Designation Transaction Under the Name Trans Multi Mechanics**

86.    Subsequent to the designations, Alex Tsai, Individual GT, and Individual A continued to conduct business together, but attempted to hide Alex Tsai's and Trans Merits's involvement in those transactions by conducting business under different company names, including, among others, Trans Multi Mechanics. This section sets forth a transaction that Alex Tsai, Individual GT, and Individual A unsuccessfully attempted to conduct prior to the designations as Trans Merits, then revived in August 2009, approximately 8 months after the designations, under the name Trans Multi Mechanics.

1.    **Overview**

87.    In late summer and early fall 2008, prior to the designations, Alex Tsai, Individual GT, and Individual A attempted to purchase a Bryant Center Hole Grinder[5] from a company named Company AM, which was located in Lincolnwood, Illinois. During that time, Individual GT represented that he was attempting to purchase the machine on behalf of Trans Merits. Individual GT's point of contact at Company AM during these negotiations was Individual MS. This transaction was not completed.

88.    However, in August 2009, nearly eight months post-designation, Individual GT and Individual A contacted a company named Company LM, located in Skokie, Illinois, about purchasing a Bryant Center Hole Grinder. Individual GT's point of contact at Company LM was Individual PS.

---

5. According to an industry executive, a Bryant Center Hole Grinder is a machine tool used to grind a center hole, with precisely smooth sides through the length of a material. According to industry materials, the Bryant center hole grinder is capable of grinding holes between .050 inches and 2 inches in diameter.

89.     In September 2009, Individual GT and Individual A purchased and exported the Bryant Center Hole Grinder under the name of Trans Multi Mechanics. However, during this transaction, Individual GT took a number of steps which demonstrate that the transaction once again involved Alex Tsai and Trans Merits.

a.      First, according to an employee at Company LM, Individual GT told Individual PS at Company LM that he worked for Trans Merits and that Trans Merits was Trans Multi Mechanic's agent when purchasing machinery in the United States.

b.      Second, according to an employee at Company LM, Individual GT gave Individual PS at Company LM a business card which indicated he worked for Trans Merits, a Global Interface Company. (Both Trans Merits and Global Interface were designated.)

c.      Third, during the negotiations with Company LM, Individual GT often cc'd Trans Merits on the emails, and even forwarded the invoice and request for payment to Trans Merits and Alex Tsai. Specifically, on September 2, 2009, Individual GT sent an email to trans.merits@msa.hinet.net stating: "Please relay to Mr. Tsai ... Please have him contact [Individual A] to see if payment can be made today."

d.      Fourth, as in the pre-designation transactions discussed above, although the invoice and/or request for payment was sent from Individual GT to Trans Merits, the actual money was transferred out of Trans Multi Mechanics's bank account to Individual GT. Significantly, and further underscoring Trans Merits's continued role in the transaction, the confirmation of the payment from Trans Multi Mechanics bank account was sent from trans.merits@msa.hinet.net to Individual GT.

2.      **Timeline of Transaction**

      a.      **Company AM (Pre-Designation)**

90.     On August 27, 2008, Individual MS at Company AM sent an email to Individual GT at "Trans Merits," attaching a proposal for the sale of a Bryant Center Hole Grinder and Pfauter Center Hole Lapper from Company AM to Trans Merits.

91.     On September 8, 2008, Individual GT sent an email to Individual R at Company AM, stating: "[Individual R], Thank Mark for his tour on last Thursday....We decided to offer you USD 10,000 for Bryant Center Hole Grinder and USD 16,000for Pfauter P630... Best regards from [Individual GT]."

92.     On September 8, 2008, Individual R at Company AM replied to Individual GT's email, stating: "[Individual GT], we thank you for your offer....the least that we can accept is $32,000 USD FOB Truck, Our Plant....If the above is acceptable we wil send you an invoice right away."

93.     On September 8, 2008, Individual GT sent an email to tmm.news@msa.hinet.net, stating "Please forward to [Individual A]" and attaching pictures of the Bryant Center Hole Grinder and another machine.

94.     On September 16, 2008, Individual GT sent an email to Individual R at Company AM, stating: "[Individual R], Thank you for your call regarding the offer for Pfauter and Bryant. We had been busy after they went back to Taiwan and finally had a chance to talk about this deal. On behalf of our partners, we appreciated your offer.  However, the best we can do is $27,500 for both machines....[Individual GT]."

95.     On September 17, 2008, Individual R at Company AM sent an email to Individual GT, stating: Company AM accepts but "we will not be able to prepare either machine for shipment at that price. We will simply put the machines onto a truck here at our plant...If the above is acceptable we will invoice Trans Merits Co. LTD today.

96.     On September 18, 2008, Individual R at Company AM sent an email to Individual GT, stating: "[Individual GT]...please let me know if the invoice should be made out to Trans Merits Co., LTD or Global Interface Incorporation."

97.     On September 18, 2008, Individual GT responded to Individual R at Company AM, stating that the invoice should be made out to "Trans Merits Co., Ltd." and provided Trans Merits's address in Taiwan.

98.     Based on my review of subsequent emails between Individual GT and individuals at Company AM, this deal was not consummated.

**b.      Company LM**

99.     On January 16, 2009, Alex Tsai, Global Interface, and Trans Merits were designated as proliferators of weapons of mass destruction.

100.    According to an employee of and records maintained by Company LM, on or about August 17, 2009, Company LM was contacted by email by an individual identifying himself as Individual A for a price quote on a Bryant Center Hole Grinder.

101.    According to an employee of and records maintained by Company LM, on or about August 17, 2009, an employee of Company LM replied by email to the request, quoting Individual A a price of $9500.

102. According to emails provided by Company LM, on or about August 21, 2009, an individual identifying himself as Individual GT sent an email to an employee of Company LM. The email read (verbatim):

> Hi Peter,
>
> This is [Individual GT] from Trans Multi Mechanics in Chicago. I have to talked to Tony about the pricing. Unfortunately, we can not afford to pay this price but we still appreciate your time. If you have other machines that we discussed in your place and they are available, please send us by email and we will review them as soon as we can.
>
> Have a good weekend.
> [Individual GT].

103. According to emails provided by Company LM, on or about August 21, 2009, an employee of Company LM responded by email to Individual GT, stating:

> Thank you for getting back to me regarding the Bryant. I would like to do my best to begin a working relationship with your company. In view of that, please let me know what your best offer is for my machine. We would affix the machine to a "stamped" skid and wrap with plastic in preparation for shipment.

104. According to emails provided by Company LM, on or about August 21, 2009, Individual GT sent an email to Company LM, stating:

> Our best offer is only about $6,500.00. I know it's kind of far away from you expected, but the current market only allows us to do that. Let me know if you have any questions.
>
> [Individual GT]

105. According to an employee of and records maintained by Company LM, on or about August 26, 2009, Individual GT visited Company LM to discuss purchasing a Bryant Center Hole Grinder. During that visit, Individual GT informed Company LM that Individual GT's company – Trans Merits Co. Ltd. / Global Interface Incorporated – acts as Individual A's

U.S. agent when purchasing used machinery in the United States. During this same visit,

Individual GT provided Company LM with a business card that stated:

> [Individual GT]
> Trans Merits Co., Ltd.
> Global Interface Incorporation
>
> Tel: +1 (312) 479-4337
> E-mail: yhtsai76@yahoo.com

106.    According to emails provided by Company LM, on or about August 26, 2009, an

employee of Company LM sent an email to Individual GT, stating, in part:

> I have decided to accept your offer of, $ 6500.00 for the Bryant. We will leave it
> on the same skid as it was at the time of your inspection and load it onto your
> truck.

107.    According to emails provided by Company LM, on or about August 26, 2009,

Individual GT sent an email, stating, in part:

> Thank you for your kindness. I have talked with Tony about it. He appreciates
> your understanding. Because he has some concerns about the machine, he wants
> to know the condition when power-on and to confirm that the instruction manual
> and circuit drawings are available. Can I revisit your facility for the machine on
> Monday morning?
>
> Also, you had mentioned that you have one similar type grinding machine with
> taller height. Can you send me its spec with photos?

108.    According to an employee of Company LM, on or about August 31, 2009,

Individual GT visited Company LM to inspect to the Bryant Center Hole Grinding Machine.

109.    According to emails provided by Company LM, on or about August 31, 2009,

Individual GT sent an email, stating:

> I have talked with Tony about today's visit. I belive we are ready to move on.
> Can you send me the invoice, bill of lading, and wire transfer instruction by

email?  I will wire the full amount within couple of days.  Below is the company info:

[Individual A]
Trans Multi Mechanics Co., Ltd.
No. 106, Yatan Road
Taichung, Taiwan

If you have any other questions, please feel free to contact me.

Best Regards,
[Individual GT]

110.    According to an employee of and records maintained by Company LM, on or about September 1, 2009, Company LM sold the Bryant Center Hole Grinder to Trans Multi Mechanics.  The sale invoice was addressed to Trans Multi Mechanics Co., Ltd., No. 106, Yatan Road, Taichung, Taiwan and to the attention of Individual A.  The sales invoice further indicated that the invoice would be sent to yhtsai76@yahoo.com.  The invoice further stated: "This machine is being sold "As-Is" and "As-Inspected" by your agent Mr. [Individual GT] of Trans Merits Co., Ltd."

111.    On September 1, 2009, Individual GT forwarded a copy of the invoice to trans.merits@msa.hinet.net and stated: "here is the commercial invoice, the packing list will come later."

112.    On or about September 2, 2009, Individual GT sent an email to trans.merits@msa.hinet.net stating: "Please relay to Mr. Tsai ... Please have him contact [Individual A] to see if payment can be made today ... Thanks ..."

113.  According to records from Harris Bank, on or about September 2, 2009, Individual GT wire transferred $6500 from his bank account at JP Morgan Chase Bank to Company LM's bank account at Harris Bank.

114.  On September 4, 2009, someone using trans.merits@msa.hinet.net sent an email to Individual GT, attaching a copy of the wire transfer for $7200 from Trans Multi Mechanic's bank account in Taiwan to Individual GT's bank account at Citibank in the United States.  (This transfer is alleged to be part of the money laundering conspiracy in Count 3 of this criminal complaint.)

115.  On September 9, 2009, an employee of Company LM sent an email to Individual GT, attaching copies of the packing list, invoice, shipper's export declaration, and certificate of origin for the Bryant Center Hole Grinder.

116.  According to records maintained by CBP, on or about September 23, 2009, Company LM exported the Bryant Center Hole Grinder to Trans Multi Mechanics Co., Ltd., No. 106, Yatan Road, Taichung, Taiwan, through Air Tiger Express.

**F.    Post-OFAC-Designation Transactions Under the Name Factory Direct Machine Tools.**

117.  Subsequent to the designations, Alex Tsai and Individual GT also imported, and attempted to import, items into the United States, but attempted to hide Alex Tsai's and Trans Merits's involvement in those transactions by conducting business under a different company name – this time Factory Direct Machine Tools – and using the email address dragon.inco@gmail.com rather than trans.merits@msa.hinet.net to conduct such business.  By conducting such business in the United States, Alex Tsai directly evaded the restrictions placed

on him by the OFAC designations. This section sets forth (1) the creation of Factory Direct Machine Tools, (2) Alex Tsai's use of the dragon.inco email address, and (3) two transactions in which Alex Tsai and Individual GT attempted to import and imported items into the United States through Factory Direct Machine Tools.

### 1. **Factory Direct Machine Tools**

118.    On July 11, 2009, Individual GT sent an email to trans.merits@msa.hinet.net, which stated: "Greetings, Following are the factories and the products I want to see—please relay to my dad—I'll discuss with him again." Individual GT then listed 6 factories and products.

119.    On August 12, 2009, Individual GT sent an email to trans.merits@msa.hinet.net, which had the subject "company name" and which stated in the text: "Please print and give to Mr. Tsai – See which one he likes ..." Individual GT then listed 5 proposed company names – Global Industrial Machinery, Machinery World, CNC World, Global Industrial Machine, and Global Machinery.

120.    In September 2009, Individual GT started using the name Factory Direct Machine Tools, through which he exported / imported machine tools from / into the United States. For example, on September 8, 2009, Individual GT sent an email to Air Tiger Express and provided his company name as Factory Direct Machine Tools.

### 2. The dragon.inco@gmail.com Email Address

121. Starting in December 2009, Alex Tsai and others at Trans Merits started using the email address dragon.inco@gmail.com to communicate with Individual GT about conducting business in connection with Factory Direct Machine Tools. For example:

122. Based on my review of the email traffic between Individual GT and Alex Tsai using dragon.inco@gmail.com, I have determined that the emails sent **from** dragon.inco@gmail.com to Individual GT are labeled "Alex Tsai" in the header line by the sender. Based on my training and experience, I know that, in Gmail, there is a setting to allow the sender of an email to specify what name appears associated with the email when it is sent to another account. Accordingly, in this case, an individual has chosen to label dragon.inco@gmail.com with the name "Alex Tsai," such that when it is received in another email account, it appears as from "Alex Tsai."

123. Evidence further establishes that Alex Tsai used dragon.inco@gmail.com to communicate with Individual GT about business transactions. For example, the search warrants revealed a number of emails from Individual GT to dragon.inco@gmail.com referencing his "father" and/or the "boss." This method of communication is consistent with how Individual GT communicated with his father at the trans.merits@msa.hinet.net address prior to the designations. For example:

a. On April 26, 2010, an individual using the email account Third Party Email 1 sent an email to Individual GT at yhtsai76@yahoo.com which has as the subject— "Please forward the revered Tsai, the first 6 items of the 7 mainland equipments." Attached to the email is a brochure and specs for a number of machine tools.

−30−

b. Later on April 26, 2010, Individual GT forwarded the above email from Third Party Email 1 to dragon.inco@gmail.com email address, stating: "Please print for Boss. Thank you."

### 3. The LED Lights

124. Between December 2009 and March 2010, Alex Tsai and Individual GT attempted to evade the restrictions imposed on Alex Tsai and his companies by the OFAC designations in connection with the possible importation of LED traffic lights into the United States. In connection with that business venture, between January 6, 2010, and March 9, 2010, Individual GT, using the email address yht.gary@gmail.com, exchanged a series of emails with Individual DH in which Individual GT requested specifications, pictures, and pricing information about LED lights. A number of the emails between Individual GT and Individual DH were copied to dragon.inco@gmail.com. For example:

a. On January 6, 2010, Individual GT sent an email from yht.gary@gmail.com to Individual DH and to dragon.inco@gmail.com. The email is addressed to "[Individual DH]" and states "I am going to put your products on the Internet. There are a few things that I need your help ..." The email then lists out a series of requests (e.g., "please provide a color picture of the LED Tunnel Lights") and ends with: "If there are other questions regarding price and sample, my father will discuss with you further. Thanks, [Individual GT]."

125. In addition, Individual GT exchanged a number of emails with Alex Tsai at dragon.inco@gmail.com about the pricing for the LED lights. For example:

a. On January 7, 2010, Individual GT sent an email to dragon.inco@gmail.com, forwarding an email from Individual DH. The forwarded email was

addressed to Individual GT and stated: "Today, I am faxing to you the price of the semi-conduct lamp and the power replacement table. I also forwarded a copy to your father. The rest will be sent when done." The email from Individual GT to Alex Tsai states: "This the price of the lamp ... discuss pricing in the U.S."

        b.      On January 27, 2010, Individual GT sent an email from yht.gary@gmail.com to dragon.inco@gmail.com, stating: "These are the price for Chris. Please print and give to Mr. Tsai. [Individual GT]." Attached to the email was a pricing list for LED lights.

        c.      On January 29, 2010, someone using dragon.inco@gmail.com sent an email to Individual GT at yht.gary@gmail.com stating: "[Individual GT]. The parts in red are the prices filled out by Mr. Tsai, please read." Attached to the email was the same pricing list for LED lights sent by Individual GT to dragon.inco@gmail.com on January 27, 2010, but with certain prices denoted in red on the attachment.

        d.      On February 3, 2010, Individual GT forwarded an email to dragon.inco@gmail.com, forwarding an email from Individual DH in which Individual DH provided Individual GT with a pricing list. In the email to dragon.inco@gmail.com, Individual GT wrote: "it's the price sheet."

        e.      On February 4, 2010, someone using dragon.inco@gmail.com sent an email to Individual GT at yht.gary@gmail.com, responding to the above email, attaching a revised price sheet.

### 4. The Oil Pump

126.     A review of the emails and CBP records reveals that, in August 2010, Individual GT imported an oil pump into the United States with the assistance of Alex Tsai and Trans Merits, thereby evading the restrictions placed on Alex Tsai and Trans Merits by OFAC. For example:

      a.     In early August 2010, an individual from Company BMTS in Massachusetts ordered an oil pump from Factory Direct Machine Tools.

      b.     On August 15, 2010, Individual GT emailed dragon.inco@gmail.com to order the oil pump: "I need an oil pump, could you help me buy one? Below is the company information ...."

      c.     On August 18, 2010, Individual GT sent an email from yht.gary@gmail.com to dragon.inco@gmail.com asking for an estimate on the shipping cost. That same day, someone using dragon.inco@gmail.com replied and provided the shipping costs for the oil pump.

      d.     On August 18, 2010, someone using dragon.inco@gmail.com sent an email to Individual GT at yht.gary@gmail.com stating: "I am sending the oil pump to the U.S. today. Attached is a picture for you to see. The estimated arrival date is 24th by FEDX. The cost is (regular) NT 1,728. Trans Merits."

### 5. The Vickers Pump

127.     On August 20, 2010, someone using dragon.inco@gmail.com sent an email to Individual GT at yht.gary@gmail.com, stating: "[Individual GT], The attached is price quotation

of the Vickers pump.[6] If you have any questions, please contact the BOSS." This email was at the end of a long chain of emails between Individual GT and Individual X negotiating the purchase of machinery. In a few of the forwarded emails, Individual GT and Individual X discussed sending money to the bank account of Individual GT's father, Alex Tsai, in Hong Kong:

- Individual X: "As for the money, could I send it to your father's account in Hong Kong? I am afraid something would go wrong if wiring it to the U.S."

- Individual X: "Last time I mentioned to wire to your father's Hong Kong account, is that okay?"

- Individual GT: "please wire the money to my father's account in Hong Kong, thanks."

## IV. Conclusion

128. Based upon the information above, I believe there is probable cause to conclude that Alex Tsai has committed each of the offenses charged in the attached criminal complaint.

FURTHER AFFIANT SAYETH NOT.

ERIC SHIFFMAN

SUBSCRIBED AND SWORN TO
this 23rd day of October 2012

Geraldine Soat Brown
United States Magistrate Judge

---

6. According to information found at http://vickerspump.org, Vickers pumps are hydraulic pumps used in many applications, including construction, agriculture, industrial, fishing, marine, mining, and lawn and garden.